Glenda Bean, Executive Director Arkansas Early Childhood Commission Office of the Governor Capitol Mall Little Rock, AR 72201
Dear Ms. Bean:
We are writing in response to your opinion request wherein you asked three questions concerning the loan guarantees to be issued by the Arkansas Early Childhood Commission pursuant to Act 202 of 1989.[1] Those questions were:
 1. "If a church or religious institution should apply to the Commission for a loan guarantee on a loan for a building which will house a childcare facility, will the Commission have any legal problems with the church/state separation issue if it grants the guarantee?"
 2. "If the building is to be multi-purpose (i.e., used for childcare during the week and for religious activities at other times) will this affect your answer to our first question?"
 3. "If the religious facility accepts the loan guarantee, will it be subject to any of the civil rights and hiring practices acts as are most institutions that accept federal and state money?"
As you will see from the following, we believe, in general, that no church/state separation issue will arise from guarantees made to religious institutions, whether or not the facility is to be multi-purpose. In addition, we do not believe that a facility's accepting a loan guarantee from the Arkansas Early Childhood Commission, itself, would subject it to civil rights and hiring practices act that apply to institutions that accept federal and state moneys. The facts pertinent to our opinion are as follows.
Under the rules and regulations adopted by the Arkansas Early Childhood Commission (hereinafter "Commission"),[2] it may guarantee 80% of loan deficiencies, up to a maximum of $25,000, for loans that are used to develop, expand or renovate Arkansas childcare facilities. The program is open to any entity that qualifies for a loan from an Arkansas lending institution.
A guarantee is different from an outright grant;[3] the Commission is required to provide its funds to the lending institution only if the entity borrowing those funds defaults under the terms of the loan agreement. See First National Bank v. Nakdimen, 111 Ark. 223, 226, 163 S.W. 785 (1914). If called upon to honor its guarantee, the Commission has the right to proceed against the defaulting party for the funds it paid pursuant to the guarantee.
In general, church/state issues arise when the state either advances or inhibits a particular religion, which would violate the establishment clause of the First Amendment.[4] A three-part test is used to determine whether a particular statute facially violates the establishment clause: first, it must have a secular purpose; second, its primary effect must not be to advance or inhibit religion; and, third, it must not foster "excessive entanglement" between the state and the religious entity. Lemon v. Kurtzman, 403 U.S. 602, 612-13
(1971).
Legislative articulation of a secular purpose normally is given deference by courts and satisfies the "secular purpose" test. Board of Education v. Mergens, ___ U.S. ___, 58 U.S. L.W. 4720, 4726 (No. 88-1597, June 4, 1990). The legislative purpose underlying the Early Childhood Commission Act, as found in its emergency clause, is "that expanded development and coordination of early childhood programs is essential to meeting the developmental and educational needs [of] young children in Arkansas. . . ." 1989 Ark. Act 202, 4. Further, the act permits the Commission to develop and implement rules and regulations to provide guarantee assistance for expansion or development of childcare facilities in Arkansas. A.C.A.20-78-505(a) (Supp. 1989). Therefore, we believe that the act will survive the "secular purpose" test under the establishment clause.
To satisfy the "primary effect" test, the action may neither endorse nor distinguish among religious sects. Allegheny County v. Pittsburgh ACLU, 492 U.S. ___, 106 L.Ed.2d 472,494-95 (1989). However, religious institutions need not be quarantined from public benefits that are neutrally available to all. Bowen v. Kendrick, 487 U.S. ___, 101 L.Ed.2d 520, 540
(1988). Because Act 202 and the regulations promulgated thereunder do not make the guarantees contingent upon a particular religious affiliation (or lack thereof), it is our opinion that the "primary effect" test will be satisfied.
In applying the "excessive entanglement" test, courts look to the character and purposes of the institutions that are benefited, the nature of the aid that the state provides, and the resulting relationship between the government and the religious authority. Lemon, 403 U.S. 615. Institutions that are benefited by Act 202 guarantees are childcare centers, without regard to their religious affiliation. See A.C.A.20-78-501, et seq. (Supp. 1989). The aid provided is not direct financial aid, but only a loan guarantee that provides no moneys absent default on the underlying obligation. In the event of such default, the Commission apparently will seek restitution from the defaulting institution, regardless of its affiliation. The Commission does not take an active role in the use of the guaranteed funds beyond ascertaining that they are to be used for the expansion or development of childcare facilities in Arkansas. A.C.A. 20-78-505(a) (Supp. 1989). Because this interaction appears to not be of the substantial or pervasive nature prohibited by the establishment clause, see Lemon, 403 U.S. 613-16, it is our opinion that the guarantees in question will not run afoul of the "excessive entanglement" test.
Based on the foregoing, it is our opinion that if a church or religious institution should apply to the Commission for a loan guarantee on a loan for a building which will house a childcare facility, the Commission will not have any legal problems with the church/state separation issue if it grants that guarantee.
Your second question raises the issue of whether the guarantees, as employed, will violate the establishment clause. Because this would be a question of fact, we cannot give you a definitive answer. As a general matter, there should be no church/state problem triggered by providing guarantees to multi-purpose facilities. However, we caution that if a pattern develops of favoring religious institutions to the exclusion of other guarantee applicants, or of not pursuing defaulting religious entities as distinguished from other defaulting debtors, then legal problems may arise. Finally, we do not believe that by accepting the Commission's guarantee, itself, a facility, religious or otherwise, will subject itself to existing federal civil rights or employment discrimination acts. 42 U.S.C. § 2000(d) (Title VI of the Civil Rights of 1964) generally prohibits discrimination in programs that receive federal financial assistance. However, 42 U.S.C. § 2000(d)-1 distinguishes guarantee contracts, inter alia, from other federal financial assistance programs; the anti-discrimination provisions of Title VI do not apply to guarantee contracts. See 42 U.S.C. § 2000(d)-4. Parenthetically, from our review of A.C.A. 20-78-504 (Supp. 1989), it does not appear that federal funds are to be used to fund the guarantee trust fund. If the Commission receives federal funds as a result of a specific federal grant to fund the trust fund, the terms of the grant should be reviewed for any anti-discrimination requirements.
As to state anti-discrimination laws, A.C.A. 26-73-108(a)(1) (1987) provides:
 No citizen in the State of Arkansas in a county, city, or local community shall, on the grounds of race, color, religion, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination of services or participation under any program or activity receiving Arkansas tax funds.[5]
While the term "receiving Arkansas tax funds" might, if viewed liberally, be construed to include loan guarantees, a facial reading of the statute leads us to the conclusion that it applies to those entities that actually receive Arkansas tax funds. Since the facilities in question never actually receive the guarantee funds, it is our opinion that the obligations imposed under A.C.A. 26-73-108(a) do not attach to facilities for whom the Commission issues its guarantees.
We trust that the foregoing will prove of assistance to you. If there exist material facts pertinent to your questions which were not contained in your opinion request, we might have to modify our opinion accordingly.
This opinion, which I hereby approve, was prepared by Assistant Attorney General Frank J. Wills, III.
Sincerely,
MARY B. STALLCUP Attorney General
MBS:FJW:jk
[1] Act 202 established the Arkansas Early Childhood Commission to assist childcare facilities in Arkansas by, inter alia, making loan guarantees available to entities seeking to improve or construct childcare facilities. See A.C.A. 20-78-502 (Supp. 1989).
[2] Act 202 itself does not specify conditions under which the guarantees are to be made, but leaves it to the Commission to develop the rules and regulations governing the amount and award of those guarantees. See A.C.A. 20-78-505 (1989).
[3] The distinction between a grant and a loan guarantee is recognized in Title VI of the Civil Rights Act of 1964, which imposes hiring requirements on those who receive federal financial assistance. Contracts of guaranty are explicitly excluded from such requirements. See 42 U.S.C. § 2000(d)(1), 2000(d)(3), and 2000(d)(4). Therefore, no public funds are "given" to the entity for which the guarantee is provided, as would be done by a grant. We believe that, under these circumstances, no church/state separation issue will arise if the Commission issues its guarantee to a church or other religious institution.
[4] State action that unnecessarily interferes with the exercise of religious beliefs may also violate the free exercise clause of the First Amendment. However, the free exercise clause does not appear to be implicated under the facts contained in your opinion request.
[5] You should also note A.C.A. 25-17-101(a) which provides: "All agencies of the state, or any department thereof, shall include in all contracts negotiated or renegotiated by them, for and on behalf of the state, a provision obligating the contractor not to discriminate against any qualified employee or qualified applicant from employment because of race, color, creed, national origin, or ancestry, and shall require the contractor to include a similar provision in all subcontracts." By its terms, this provision appears to be limited to contracts between the state (or its agencies) and its contractors, not third party beneficiaries thereof, which would be the status of the facilities for which the guarantees are made.